STATE, EX REL. JOHN J. LEDWITH, RELATOR, V. LAWSON G. BRIAN, TREASURER, RESPONDENT.

FILED APRIL 6, 1909. No. 16,058.

1. **States:** APPROPRIATIONS: SURPLUS. Under the constitutional provisions as to the ending of appropriations with the expiration of the first fiscal quarter after the adjournment of the next regular session of the legislature (art. III, sec. 19), it is not essential that the money be actually drawn during the two-year period, but the expense must have been incurred during the two years for which the appropriation was made. It is the unexpended surplus of the amount appropriated that lapses, not the uncollected portion of an appropriation.

2. ———: TAXATION: APPROPRIATION. An appropriation of "the proceeds of the one mill tax for the years 1907 and 1908" is an appropriation of the whole amount of the tax, and not of that portion only which was actually collected during the biennium.

3. **Public Lands:** GRANT TO STATE: CONSTRUCTION. By the terms of the acts of congress granting public lands to the state for the use and support of the university and agricultural college, and by the acceptance of the grants by the state, and the pledges contained in the state constitution and statutes with reference thereto, the state became a trustee of the funds derived from such grants for the sole purpose of applying them to the objects of the grant, and with no power to divert the same to other purposes or to render them general funds of the state.

4. **States:** APPROPRIATIONS. The acts of the legislature of the state appropriating the income from said grants to the use of the university and agricultural college, creating a board of regents, and conferring power and authority upon that body to draw and

expend such funds, and upon the state auditor to issue and the state treasurer to pay warrants from such funds, is a complete appropriation to the beneficiary of the income from such trust funds.

5. ———: ———. The provisions of section 19, art. III of the constitution, providing for biennial appropriations, are not applicable to such trust funds, so devoted by congress to a specific use.

ORIGINAL application for a writ of mandamus to compel respondent, as state treasurer, to countersign a warrant drawn on the university temporary fund. *Writ allowed.*

*Charles S. Allen,* for relator.

*William T. Thompson, Attorney General,* and *Grant G. Martin, contra.*

LETTON, J.

This is an application for a mandamus to compel the state treasurer to countersign a warrant for the sum of $35 issued by the state auditor and payable from the university temporary fund. The state treasurer's return to the writ alleges that he refused to countersign the warrant for the reason that there is no money in the temporary university fund with which to pay the same or to become available for its payment; that he has paid and canceled warrants on this fund to the amount of $661,-297.40, and that there are $138,651.22 of outstanding warrants against it; that his collections have been from taxes $569,312.60, and from interest on investments $69,728.07; that, estimating the amount of taxes which will be received by him during the remainder of the biennium with reference to the amount already paid in warrants, warrants have already been issued to a greater sum than the total collections will amount to for the biennium, and that all taxes collected after the end of the first fiscal quarter after the adjournment of the present legislature lapse, as provided by section 19, art. III of the

constitution; that the appropriation of the proceeds of
the one mill tax for the years 1905 and 1906 not appro-
priated by the leglislature of 1905 is a nullity for the
reason that the appropriation of that legislature exceeded
the whole of the one mill tax for these years; and that
the income from the university permanent investment
was not appropriated by the legislature, and hence said
income cannot be used in the payment of warrants until
appropriated.

1. The first point made by the respondent is that under
the constitution appropriations made by the legislature
of 1907 end with the expiration of the first fiscal quarter
after the adjournment of the present legislature, and that
consequently all taxes collected after the end of that
fiscal quarter cannot be credited to the university fund
or be included in calculations made to ascertain the
money accruing to said fund. The language of the ap-
propriation act is: "The proceeds of the one mill uni-
versity tax for the years 1907 and 1908 and so much of
the proceeds of the one mill tax for the years 1905 and
1906 as was not appropriated at the last session of the
legislature are hereby appropriated for the biennium end-
ing March 31, 1909 to the use of the state university for
current expenses, buildings and permanent improve-
ments, as directed in section 19, ch. 87, Compiled Statutes
of Nebraska of the year 1905." Laws 1907, ch. 151.
Several of the points argued in the hearing of this case
were decided in the case of *State v. Searle,* 79 Neb. 111.
In that case it was held that the appropriation of the
proceeds of the one mill tax for the years 1907 and 1908
was a specific appropriation within the meaning of the
constitution; that the appropriation was certain because
it can be made certain, and that warrants might be drawn
against the fund whether the money was actually in the
treasury or not, as long as the warrants did not exceed
the amount of the appropriation. See, also, opinion of
POUND, commissioner, in *Weston v. Herdman,* 64 Neb.
24, 30. Respondent now contends that, because the legis-

lature used the words "the proceeds of the one mill tax," and since the constitution (art. III, sec. 19) provides that each appropriation shall end with the expiration of the first fiscal quarter after the adjournment of the next regular session of the legislature, the treasurer has no right to countersign warrants in excess of the amount collected or which in all probability will be collected during the biennium. We think that, under the constitutional provision as to the ending of appropriations, it is the unused or unexpended surplus of the amount appropriated that lapses into the general fund, and not the uncollected portion of an appropriation, as the respondent contends. To illustrate, if an appropriation of $100,000 is made from a certain fund, and if when the end of the biennium arrives only $90,000 has been used or expended, either by the issuance and payment of warrants or by their issuance and registration under the law, then $10,000 would lapse; on the other hand, if the whole $100,000 had been expended by the issuance of warrants, there would be nothing unexpended which could lapse. The uncollected portion of the appropriation could not lapse, if its collection had been anticipated by the issuance of warrants. *Opinion of the Judges*, 5 Neb. 566. The object of the constitutional provision requiring biennial appropriations for the support of the government is to render all departments of the state government dependent upon the will of the people as expressed by its representatives and to require the return to the source of power every two years for the necessary means of existence. The conservation of our liberties by the fathers in the past depended largely upon the control of the purse by the representatives of the people. *State v. Moore*, 50 Neb. 88; *Ristine v. State*, 20 Ind. 328; *Humbert v. Dunn*, 84 Cal. 57; *Clayton v. Berry*, 27 Ark. 129; *McCauley v. Brooks*, 16 Cal. 11; *State v. King*, 108 Tenn. 271.

Appropriation laws, as well as all others, should be

construed ·so as to promote and effect their object and
design.   Note to *Carr v. State,* 22 Am. St. Rep. 624, 638
(127 Ind. 624).   This we think would not be done if we
held that no money could be expended in advance of its
collection during the biennium, under the provisions of
the appropriation.   In order to constitute an appropria-
tion, the only things necessary are that an amount be
specified and a fund be provided out of which the money
shall be paid.   It is not essential that the money be in
the treasury either at the time of the appropriation or
at the time that warrants are issued in payment of claims
under the appropriation, unless in the latter case the law
expressly limits in some way the issuance of warrants.

We are also of the opinion that the appropriation was
of the whole amount of the tax, and not of that portion
only which was actually collected during the biennium.
If the act had said "that portion of the proceeds of the
one- mill tax for 1907 and 1908 which will be collected
during the biennium," it would then have meant what the
respondent contends, but this is not what the legislature
said.   The Century dictionary defines "proceeds" as "the
amount proceeding or accruing from some possession or
transaction."   Webster defines it as "yield, issue, pro-
duct."   Levy is defined by the Century as "the amount
accruing from a tax or an execution."   To appropriate
"the ,one mill levy" would seem, under these definitions,
to be the same as to appropriate "the proceeds of the one
mill levy," and we think the expressions have no different
force or effect.   In *People v. Auditor,* 12 Ill. 307, the su-
preme court of Illinois speaks of the fund·created by a
tax of two mills on the dollar as "the proceeds of the two-
mill tax," and treats the appropriation as specific, though
limited by a further provision as to annual collections
not contained in our constitution.

We are of the opinion that the legislature intended to
appropriate an amount of money equal to that produced
by the collection of one mill upon each dollar of assessed
valuation in the state.   The appropriation could be

made specific by a mere matter of computation, and the
case is no different than if the legislature had made the
computation and inserted the amount in the act.   As
soon as the grand assessment roll was ascertained, the
sum became fixed and certain.   The constitutional pro-
vision limiting the duration of the appropriation to the
end of the first fiscal quarter after the adjournment of
the legislature only applies if the fund appropriated has
not been exhausted by the issuance of warrants upon it
during the biennium.   In such case whatever unexhausted
surplus there might be would lapse.   It is argued that
this construction of the law may result in creating a
deficit, and that warrants may be issued which there is no
money to pay.   We can only say that this is a matter for
the legislature.   In a number of instances it has limited
the issue of warrants to a certain per cent. of the levy, or
restricted their issuance except when there was money in
the treasury to meet them, but this it failed to do in this
instance.   While we may question its good judgment in
making the appropriation in such a form, we cannot in-
terfere with its action, and we think it is entirely proper
for the auditor to issue, and the duty of the treasurer to
countersign, warrants to an amount equal to the whole of
the one mill levy.

2. The next question necessary to decide is whether
the money arising from the rental of university lands and
interest upon deferred payments for sales of such lands
can be drawn without a specific biennial appropriation.
This fund is primarily derived from the act of congress
approved July 2, 1862 (12 U. S. Statutes at Large, ch.
.130, p. 503), donating public lands to the several states
for the endowment, support and maintenance of colleges
of agriculture and the mechanic arts, and from the act to
enable the people of Nebraska to form a constitution and
state government, passed April 19, 1864 (13 U. S. Stat-
utes at Large, ch. 59, p. 47).   Section 10 of this act pro-
vided: "That seventy-two other sections of land shall be
set apart and reserved for the use and support of a state

university, to be selected in manner as aforesaid, and to be appropriated and applied as the legislature of said state may prescribe for the purpose named, and for no other purpose." The constitution of Nebraska adopted in 1866 (art. VII, sec. 1) provided: "The principal of all funds arising from the sale, or other disposition of lands or other property, granted or entrusted to this state for educational and religious purposes, shall forever be preserved inviolate and undiminished; and the income arising therefrom shall be faithfully applied to the specific objects of the original grants or appropriations." The preamble to the act of congress of February 9, 1867 (14 U. S. Statutes at Large, ch. 36, p. 391), which provided for the admission of the state of Nebraska to the Union recites: "Whereas, on the twenty-first day of March, A. D. 1864, congress passed an act to enable the people of Nebraska to form a constitution and state government, and offered to admit said state, when so formed, into the Union, upon compliance with certain conditions therein specified; and whereas it appears that the said people have adopted a constitution which, upon due examination, is found to conform to the provisions and comply with the conditions of said act, and to be republican in its form of goverment, and that they now ask for admission into the Union: Therefore," etc. The provision of the enabling act making the grant, and of the constitution of 1866 setting apart and pledging the principal and income from such grant "to the specific object of the original grant or appropriation," and the subsequent act admitting the state into the Union under such constitution constituted a contract between the state and the naional government relating to such grants. By section 1, art. XVI of the constitution of 1875, it was "ordained and declared" that "all laws in force at the time of the adoption of this constitution, not inconsistent therewith, and all * * * contracts of this state * * * shall continue to be as valid as if this constitution had not been adopted." This provision carried forward into the new

constitution the pledge made in the constitution of 1866, and a further pledge was made by sections 2 and 9, article VIII of the constitution of 1875.  Section 2 provides: "All lands, money, or other property granted, or bequeathed, or in any manner conveyed to this state for educational purposes shall be used and expended in accordance with the terms of such grant, bequest, or conveyance." ·Section 9: "All funds belonging to the state for educational purposes, the interest and income whereof only are to be used, shall be deemed trust funds held by the state, * * * and such funds, with the interest and income thereof, are hereby solemnly pledged for the purposes for which they are granted and set apart, and shall not be transferred to any other fund for other uses." The agricultural college grant of 1862 was specially accepted by the legislature on February 12, 1869, and the faith of the state pledged to the faithful performance of the trust. 2 Complete Session Laws of Nebraska, 1866-1877, p. 517. By section 19, ch. 87, Comp. St. 1905, the income from these grants is placed by the legislature in the temporary university fund and this fund is specifically appropriated and directed to be applied by the board of regents of the university "to any and all university needs."  The section further provides "disbursements from the four. funds (one of which is the one in question) last named herein shall be made in accordance with * * * section 25, ch. 87, Comp. St. 1897."  The section referred to provides that "disbursements from the university fund shall be made by the state treasurer, upon warrants drawn by the auditor, who shall issue warrants upon certificates issued by the board of regents, signed by the secretary and president.  All money accruing to the university fund is hereby appropriated to the use of the state university." By the provisions of "An act to make the state treasurer, treasurer of the state and university and custodian of its funds and to define the duties of such treasurer," passed in 1907 (laws 1907, ch. 147), the state treasurer was made the treasurer of the state university and the custodian of

all funds donated to the university or agricultural experiment station by the United. States, and it was further provided by section 2 of the act: "University funds other than those created by taxation shall be held subject to the order of the board of regents, and shall be disbursed for the purposes enumerated in section 19, ch. 87, Comp. St., on presentation of warrants on the auditor of public. accounts to be issued on certificates of the board of regents executed as required by law."

From a consideration of these provisions of the constitutions and statutes of this state, and of the statutes of the United States, it seems clear to us that the fund created by the grant in the enabling act and by the agricultural college act of 1862 were taken by the state as a trustee for the benefit of the university and agricultural college; that these funds cannot be diverted to any other purpose; that they have been specifically appropriated to the use of the university by the statutes mentioned, and that a board has been created with power to disburse the same, and the manner and method of the disbursements fully provided for. This is the ground taken by the courts of other states. *Massachusetts Agricultural College v. Marden,* 156 Mass. 150; *People v. Davenport,* 117 N. Y. 549; *In re Agricultural Funds,* 17 R. I. 815; *Brown University v. Rhode Island Agriculture & Mechanic Arts,* 56 Fed. 55. In *State v. Maynard,* 31 Wash. 132, an act which directed that part of the proceeds of the normal school land grant in the enabling act of that state to be devoted to pay for the erection of normal school buildings in violation of the terms of the trust imposed by the grant was held void; the state as trustee having no power to divert the fund. We can see no reason for a biennial appropriation of these funds. It was the pledged duty of the state to apply them to the use of the university and agricultural college, and the motives which prompted the makers of the constitution to hold the purse strings in the hands of the people cannot apply to the situation presented. The regents of the university under

the law are the proper persons and the only persons who may expend this money, and it can be used for no other purpose.

We are further of the opinion that, when once set apart and appropriated to the proper custodian and beneficiary, subsequent biennial appropriations are not required. We are not alone in our views. The constitution of the state of Washington provides (art. VIII, sec. 4) : "No moneys shall ever be paid out of the treasury of this state, or any of its funds or any of the funds under its management, except in pursuance of an appropriation by-law; nor unless such payment be made within two years from the first day of May next after the passage of such appropriation act." The United States granted to the state of Washington in the enabling act certain lands for the purpose of erecting public buildings. The legislature of Washington created a "state capitol commission" and gave it power to enter into a contract for the erection of a capitol building, to audit claims for their erection of same, and to issue warrants upon the "state capitol building fund" for the amount. It was also provided that a fund to be known as "the state capitol building fund" should be created by the proceeds of the sale of the lands granted. It was contended in *State v. McGraw*, 13 Wash. 311, that such funds could only be paid out under the provisions of the section of the constitution providing for specific biennial appropriations, but it was held that the money was "charged with a special trust  *  *  * and 'must be disbursed in accordance with the terms of the trust.'" The court further said: "In thus disposing of the case we give full force to the various provisions of the constitution relating to the different officers of the state who are made respondents in this proceeding, but it may well be doubted whether the limitations of the constitution are at all applicable to the subject which we are here considering, inasmuch as the whole subject matter of this case relates to the donation from the congress of the United States of lands for the purpose of erecting a

suitable building at the capital of the state. For such purpose, and only for such purpose, were the lands granted. It would be beyond the power of the legislature to use an acre of said lands for any other purpose or to appropriate a dollar of the funds arising from their sale to the accomplishment of any other object. It would have been entirely competent for congress, the donor, to have particularly designated the manner in which the lands should be sold and their proceeds applied." While the decision of the case was not placed upon this point, we are satisfied the reasoning is correct.

A similar question as to the necessity of biennial appropriation of trust funds has already been before this court. In *State v. Searle,* 77 Neb. 155, the question was as to the fund derived from the "Adams bill." In that case money in the hands of the state treasurer as treasurer of the university was held to be a trust fund not requiring biennial appropriations. The language of the act of congress making the grant, however, was more specific than of those we are now considering, in that it provided that the money should be paid by the secretary of the treasury to the treasurer of the experiment station. It was held that the money was paid under the act to the "state treasurer as the agent of the board of regents and custodian of the funds of the university." In the opinion, in speaking of the fund involved in *State v. Babcock,* 17 Neb. 610, and other cases therein cited, it was inadvertently stated that "the fund in question was money paid into the state treasury as taxes, and therefore it belonged to the state until specifically appropriated * * * to the use of the university." Only a portion of the money sought to be used was derived by taxation. In the *Babcock* case it was properly decided, under the facts presented, that "the regents of the university, in the absence of an appropriation by the legislature, have no power to dispose of the endowment fund or that derived from the three-eighths mill tax." It is stated in the opinion that the bill making appropriations for the university provided that

the money should be appropriated out of the regents' fund, but that by some means during its passage the provisions of the bill were changed, making the appropriations out of the general fund, and it was said: "The regents, however, can only use such funds as are placed by the legislature in their control." This must be true. If the legislature had failed to provide that the state university was the proper beneficiary of these funds and had failed to specifically set apart these funds to its use, there can be no doubt that no authority would exist in the board of regents to expend the fund, or in the auditor to draw, or in the treasurer to countersign and pay, warrants upon it.

We are of the opinion that, when the state accepted from congress the trust as to the disposition of these funds, carried it out by designating the state treasurer as the custodian thereof, and further designated the beneficiary, and provided the manner in which the funds should be drawn and expended, it was not fettered or controlled by the provisions of section 19, art. III of the constitution, providing for biennial appropriations, and that such trust funds may be and have been applied by a specific and general appropriation which was within the power of the legislature to make, and which must stand until changed by the legislature. As to the details regarding the funds involved, we are not fully advised, but enough appears to justify us in requiring the respondent to countersign the warrant presented by the relator.

WRIT ALLOWED.

ROSE, J., dissenting.

The auditor of public accounts drew a state warrant in favor of relator for $35 to pay him for services as an instructor in the law department of the university of Nebraska and the state treasurer refused to countersign it for the reason there was no legislative appropriation available for its payment. In a single sentence of relator's application for mandamus he asks relief as fol-

lows: "Relator prays a writ of mandamus requiring the respondent to countersign the warrant and place to the credit of the university for the biennium ending March 31, 1909, the sum of $946,017.96." Relief for the credit prayed has not been granted, but the treasurer is required to countersign the warrant. The following is the concluding paragraph of the opinion:

"As to the details regarding the funds involved, we are not fully advised, but enough appears to justify us in requiring the respondent to countersign the warrant presented by the relator."

1. I join in the finding that we are not fully advised as to the details regarding the funds involved, but dissent from the conclusion that enough appears to justify us in requiring the state treasurer to countersign relator's warrant. If an instructor in the law department of the university is a proper relator to apply for a writ commanding the state treasurer to credit that institution with the sum of $946,017.96, I think we ought to require him to point out the lawful appropriations comprising that sum, and not leave us unadvised as to the details regarding the funds involved. If there is an unexpended appropriation out of which the state treasurer may lawfully pay the warrant for $35, I am of the opinion relator should be required, as a condition of relief, to describe it in definite and precise terms, especially under a constitution providing that "each legislature shall make appropriations for the expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular session"; that "all appropriations shall end with such fiscal quarter"; and that "no money shall be drawn from the treasury except in pursuance of a specific appropriation made by law." When these provisions of the constitution are respected, there is never any mistake or uncertainty about the identity of any appropriation or the amount of any unexpended balance in any fund in the state treasury. By reason of his official relations with the state the treasurer is in a position

to ascertain the amount of each appropriation and the unexpended balance in every fund under his control. His records are open books and impart his knowledge to relator. There is a presumption that the treasurer's duties are being performed according to law. A relator who asserts the contrary and asks us to subject the treasurer to coercive process should point out a plain, definite, statutory duty which that officer refuses to perform. Since the writ could not be allowed as prayed, I think it should have been denied. We did not grant relator's prayer to compel the state treasurer to credit the university with $946,017.96, but confessed we were not fully advised by the pleadings or the evidence as to the details regarding the funds involved. The burden was on relator. In my judgment, our failure to grant his prayer in the form in which it appears in his own application for mandamus ought to have resulted in a dismissal of his case. As I view the record, the allowance of the writ was a radical departure from the proper rules of procedure.

2. For the use of the state university the legislature in 1907 appropriated "the proceeds of the one mill university tax for the years 1907 and 1908." Laws 1907, ch. 151. In the opinion of the court "the *proceeds* of the one mill university tax" is held to mean the *"whole of the tax."* It is a matter of common knowledge that the whole of a tax on the assessable property in the state is never collected. I think the word "proceeds" was used by the legislature in its ordinary sense. By the language used the lawmakers meant the funds arising from the tax, and did not intend to appropriate that portion of the tax which will never be collected. The uncollectible part of the tax is not proceeds. According to my understanding of the law, the interpretation that the words "proceeds of the one mill university tax" means "the one mill university tax" strikes from the statute the word "proceeds" and is a violation of the established canon of construction that effect must be given to every word of the statute, if possible. If the legislature intended to appropriate the

whole of the tax, the word "proceeds" would have been
omitted.    Appropriation of the proceeds of a tax means
appropriation of the fund arising from the tax.    *People
v. Auditor,* 12 Ill. 307; *People v. Miner,* 46 Ill. 384.    Be-
fore the appropriation was construed by this court no
court ever held, so far as my investigation goes, that the
proceeds of a tax was the whole of the tax, nor have I
been able to find such a meaning of the word in the con-
nection in which it is used by the legislature in the defini-
tion of any lexicographer.    The one mill tax will never
be collected in full.    If the legislature appropriated the
whole of the tax and authorized the issuance of warrants
to the full amount, some of them will never be paid out
of the funds appropriated.    The creation of a deficit by
means of an appropriation bill is inconsistent with legis-
lation making provision for the expenses of government.
I am unwilling to  attribute to the lawmakers an inten-
tion to create a deficit in the manner described or to im-
pute to them a want of business sense not warranted by
the language of the statute.    I am firmly convinced the
legislature did not intend that the treasurer should
countersign warrants against the whole of the one mill
tax.

3. The state constitution provides that "each legisla-
ture shall make appropriations for the expenses of the
government until the expiration of the first fiscal quarter
after the adjournment of the next regular session"; that
"all appropriations shall end with such fiscal quarter";
that "no money shall be drawn from the treasury except
in pursuance of a specific appropriation made by law";
that "the general government of the university of Ne-
braska, shall, under direction of the legislature, be
vested in a board of six regents," and that "their duties
and powers shall be prescribed by law."    These constitu-
tional provisions have had a contemporaneous, long-
continued and practical construction by both the legisla-
tive and executive departments of government, to the
effect that biennial appropriations by the legislature are

essential to the lawful expenditure of the endowment and other funds devoted exclusively to the university. I think this construction is right and that we ought to follow it. Two members of the constitutional convention who participated in the deliberations of that body afterwards constituted a majority of this court, one of them being the present chief justice and the other Judge MAXWELL. In an opinion by the latter these jurists took the same view as the legislative and executive departments of government, and after citing *Regents v. McConnell,* 5 Neb. 423, and *State v. Liedtke,* 9 Neb. 468, said: "These decisions were rendered by an unanimous court, after full and careful consideration of the question, and are decisive of this case. The regents, therefore, in the absence of an appropriation by the legislature, have no right to appropriate any part of the regents' fund. That the legislature should make ample appropriations for the support of the university will be conceded, and that it will do so there is but little doubt. Ample appropriations have been made, so far as appears, for the support of every department of the university and agricultural college, authorized by the legislature for the years 1885 and 1886. No attempt has been made or will be made, or is threatened, to divert the funds to any other purpose, or in any manner to defeat the object of the grant. It is well known that the bill making appropriations for the university and agricultural college provided that the money should be appropriated out of the regents' fund; but, by some means, during its passage, the provisions of the bill were changed, making the appropriation out of the general fund. As the same mistake occurred a few years ago, and it is well known to be a mistake, it shows a want of care on the part of those having the matter in charge. The alleged mistake, however, materially adds to the burdens of taxation of the people of the state, but does not in the slightest degree affect the efficiency or usefulness of the university. The regents, however, can only use such

funds as are placed by the legislature under their control." *State v. Babcock,* 17 Neb. 610.

The endowment and other trust funds of the university must be disbursed under biennial appropriations the same as the funds appropriated for other state institutions. *Regents v. McConnell,* 5 Neb. 423; *State v. Moore,* 46 Neb. 373. University funds in the hands of the state treasurer can only be drawn out in pursuance of specific appropriations. *State v. Liedtke,* 9 Neb. 468. An appropriation can only extend to the end of the next fiscal quarter succeeding the adjournment of the next regular session of the legislature, and an appropriation for a longer period is unconstitutional and void. *State v. Moore,* 50 Neb. 88. The university is a state institution. Its legal obligations are obligations of the state, whether payable out of trust funds or funds arising from general taxation. The constitution provides a definite method of paying the expenses of the state institutions. That method requires biennial appropriations. No provision is made by the constitution for any other plan. If the fiscal system so established and maintained and as thus understood by all three departments of the government for many years is to be abandoned, the change should be made by constitutional amendment. It may be that the trust funds of the university should be disbursed under a perpetual appropriation which has the effect of clothing the regents with power to make contracts pledging such funds to specific purposes or projects for long and indefinite periods in the future without the disturbing factor of intervening legislation, but I am fully convinced that such power has not been conferred upon them by any statute of this state, or by the constitution, or by any act of congress. Entertaining these views, I am compelled to dissent from the opinion and judgment of my associates.