No. 30,967.

D. L. VOSHELL, *Appellant*, v. INDIAN TERRITORY ILLUMINATING OIL
COMPANY, *Appellee*.

(19 P. 2d 456.)

Opinion filed March 11, 1933.

W. H. Carpenter and W. R. Carpenter, both of Marion, for the appellant.
Fred M. Carter, of Bartlesville, Okla., for the appellee; James A. Cassler,
of McPherson, of counsel.

The opinion of the court was delivered by

DAWSON, J.: This was an action for a balance of money alleged
to be due on oil royalties.

The defense included some special pleading, an accounting of the
oil production and its proceeds, and an allegation that the actual
amount due plaintiff had been tendered and declined.

On issues joined the controlling facts were developed without seri-
ous dispute. It appears that plaintiff had an interest in a tract of
land in the southern part of McPherson county. Defendant held
the lease thereof and had developed two producing oil wells thereon.
For some time this oil was delivered and sold to the Prairie Pipe
Line Company, which had gathering lines in the vicinity. Other
lessees had producing wells thereabout, and several other pipe-line
companies were receiving and buying oil in the same locality. There
was a custom of "posting" the price which these buying and trans-

porting pipe-line companies would pay, and that posted price was generally regarded as the market price for oil in that area.

Prior to December 1, 1930, when defendant turned its oil into the lines of the pipe-line company, the latter paid for it on division orders, and plaintiff regularly received his royalty share, which was one sixty-fourth of the total production from the lease of present concern. About that date difficulties of production control, falling prices, and shrinking markets began to affect the McPherson county oil field. The Prairie Pipe Line Company quit buying, and for some time defendant found it impossible to secure a buyer for its oil. It was further embarrassed by the necessity of pumping its oil wells to prevent their destruction. Eventually defendant negotiated arrangements with the Skelly Oil Company, which had a pipe line from the McPherson field to Valley Center, and with the Empire Pipe Line Company, which had a pipe line from Valley Center to El Dorado, whereby the transportation facilities of these companies could be had so that defendant could reach a market for its oil at El Dorado. For these services a charge of twelve and one-half cents per barrel was exacted (seven and one-half to Valley Center, and five cents to El Dorado). Division checks were made and tendered to plaintiff for his net share of the selling price, which was the posted price in the McPherson field less transportation charges to El Dorado. Plaintiff declined to accept the amount of royalties due him computed on that basis, insisting that he was entitled to one sixty-fourth of the proceeds of sales based on the posted price in the oil field without deduction for transportation charges to the El Dorado market.

This lawsuit followed. A jury was waived, the evidence adduced, the trial court made findings of fact and conclusions of law in favor of defendant and gave judgment accordingly.

Plaintiff appeals, urging various matters which will be noted as presented. He first calls attention to the lease, which contained the usual terms, including the recital that it was granted—

"For the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, towers, stations and structures thereon to produce, save and take care of said products, . . ."

In consideration for the granting of the lease, the lessee agreed—

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises.

. . . . . .. . . . . . . . . . . . .

"3d. . . . When requested by lessor, lessee shall bury his pipe lines below plow depth.

. . . . . . . . . . . . . . .. . .

"Lessee shall pay for damages caused by its operations to growing crops on said land."

From these terms appellant argues that if and when it became impossible to find a buyer for the oil in the McPherson county field, it became defendant's duty to build sufficient tanks on the leasehold to save and care for all the oil being produced thereon. According to this theory, so far as the exigencies of the situation required, the leased premises should have been turned into a "tank farm" for the storage of the oil. We think not. The lease contract was manifestly formulated on the assumption of both lessor and lessee that pipe-line facilities would be available in the vicinity to which wells developed on the premises could be connected. Sale and division of the proceeds of the oil runs were contemplated. Indeed, the lease contract fairly indicated the intention of the parties that the use of the land for farming purposes should not be materially affected. The pipe lines were to be buried below plow depth at the lessor's request; and it was contemplated that crops were to be grown on the land, and any damages thereto were to be paid for. But of greater interpretative significance, we think, is the fact that in such oil and gas leases as the one before us, which was the familiar producer's form which has been the subject of numberless lawsuits in this jurisdiction, the lessee's duty to save and care for the oil and to deliver the lessor's shares free of cost in the pipe line to which the lessor should connect his lines has never been construed to mean that the lessee should be bound to construct an indefinite number of tanks on the leased premises for the storage of oil when the pipe-line carriers and oil buyers went out of business. On this point we agree with the trial court's conclusion, which reads:

"Such a construction of the lease contracts would be eminently unfair . . . and certainly was not within the contemplation of the parties when the lease was made."

In the analogous case of *Scott v. Steinberger*, 113 Kan. 67, 213 Pac. 646, the lessee could find no buyer for the gas it had developed nor any pipe line in which to transport it, so it built a pipe line from the production field to certain markets where the gas was sold at fifteen cents per thousand cubic feet. It was shown that a .

proper charge for transporting the gas was seven cents per thousand, and that eight cents per thousand was a fair price at the point of production. The trial court held that the lessor was entitled to his royalty share of the selling price at the market, but this court ruled otherwise. The chief justice said:

"We think the parties contemplated, and the provision should be construed, that gas, if produced, should be measured and the price determined at the place where the wells were connected with pipe lines, and not at some distant market that might be found at the end of a pipe line remote from the field and where the cost of transportation might equal or exceed the value of the gas produced. If the pipe line had been built by defendants to Kansas City or Chicago, and the gas transported and marketed there at four or five times its value at the place of production, would it be contended that the price received at either of these distant markets should be the measure of defendant's liability? . . . The lessor was entitled to one-eighth of all that was placed in the pipe lines for transportation purposes. Owing to its nature his share could not be set apart in kind and delivered to him. It could only be measured by a meter as it passed through a pipe which connected with the wells. . . . The place of measurement and for fixing the lessor's share was at the connection with the pipe line. If there was a market price at the point of delivery, that would control, but if there was no market price there, then the lessor would be entitled to the reasonable value thereof, to be ascertained upon competent evidence." (p. 69.)

Counsel for appellant press on our attention the case of *Clark v. Slick Oil Co.*, 88 Okla. 55, where it was held that the expense of providing tanks, where oil in its natural state had to be treated in order to make it marketable and acceptable in the pipe line, was chargeable to the lessee. We think our own precedent, *Scott v. Steinberger*, supra, has a much closer analogy to the one at bar than this Oklahoma case.

While it was not raised in the pleadings, the logical implication of appellant's argument is that defendant's liability is substantially the same as if it had been guilty of downright conversion of plaintiff's share of the oil. He argues, "the measure of damages in this case, we think, is the value of the posted or market price of the oil taken by appellee in the Voshell field in McPherson county at the time it was so taken." It is, of course, the rule in conversion that the wrongdoer is liable for the value of the property at the time and place of its conversion. (*Gentry v. Kelly*, 49 Kan. 82, 87, 88, 30 Pac. 186; 38 Cyc. 2092-2094.) So, if the disposition of plaintiff's royalty oil which defendant made should be regarded as conversion, the measure of damages would be what it was worth at the time

defendant turned it into the Skelly Oil Company's pipe line to be transported for sale in El Dorado. Just what was plaintiff's oil worth in the Voshell field at that time? It could not be sold at all. Appellant argues that the "posted price" should be regarded as the market price. While ordinarily these prices would be the same, a market price presupposes the existence of a market. But there was no market. At the time defendant perfected arrangements to pipe the oil to El Dorado, nobody was paying the "posted price" except the limited few who were fortunate enough to have pipe-line connections in the field.

Witness Sleppy testified:

"Q. Did your company have a market for the oil you produced in the Voshell pool a year ago?

"A. We did not.

"Q. Did you have a market for a portion of your oil? A. Yes, sir, for a part of it.

"Q. Did you try, in your capacity as a representative of your company, to find a market for the sale of your oil over and above what the Shell took? A. I did.

"Q. Was the condition there that you could get any pipe-line company to connect with new customers?

"A. You could get nobody to connect.

"A. We tried all other companies and was unsuccessful in selling any, and that was our last resort.

"There was a market price on the amount that you could sell, but the amount produced over what you could sell, there was no market price for."

Witness Hume testified:

"A. In my opinion there was no market or market price for the oil which did not have a pipe-line market outlet on connections prior to the Prairie's withdrawal as a purchaser from the field."

Witness Pickrell testified:

"Q. Were there any pipe lines purchasing oil in that territory in that field besides the Prairie at the time it discontinued?

"A. The Derby Oil Company, the Sinclair Oil & Gas Company, the Stanolind Oil & Gas Company, the Shell Petroleum Corporation and the Skelly Oil Company.

"Q. Did they purchase any oil other than their own leases? A. They did not.

"Q. That wouldn't signify a market for the other companies? A. No, sir."

From this and much similar evidence the trial court correctly concluded that there was no market in the Voshell field for the oil in which these litigants were interested, and, therefore, the value of plaintiff's royalty oil at the time and place it was turned into the pipe line was not shown, and, in consequence, plaintiff failed to show any damage in excess of the amount tendered him—the selling price at El Dorado less the cost of transportation.

There is nothing further in this appeal which needs discussion. Substantial justice was done, and no prejudicial error was committed. The judgment is therefore affirmed.