No. 72,663

THE KANSAS BAPTIST CONVENTION and HUGOTON ENERGY CORPORATION, *Appellees/Cross-Appellants,* v. MESA OPERATING LIMITED PARTNERSHIP and HUGOTON CAPITAL LIMITED PARTNERSHIP, *Appellants/Cross-Appellees.*

(898 P.2d 1131)

Opinion filed July 14, 1995.

*Donald W. Bostwick,* of Adams, Jones, Robinson and Malone, Chartered, of Wichita, argued the cause, and *Michael P. Dreiling,* of Sharp, McQueen, McKinley, Dreiling and Morain, P.A., of Liberal, was with him on the briefs for appellants/cross-appellees.

*Richard D. Greene,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Robert W. Coykendall,* of the same firm, was with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is the second time this case has been before the court. Originally, this was an action brought by the Kansas Baptist Convention (Baptists) and Hugoton Energy Corporation (Hugoton Energy) against Mesa Operating Limited Partnership (Mesa) to avoid or reform a 1952 contract, which fixed the price at which the Baptists and Hugoton Energy sold gas to Mesa and required them to pay actual costs and expenses. The district court concluded that Mesa had breached and thereby voided the contract as of May 25, 1988. The district court awarded damages to the Baptists and Hugoton Energy for the period between breach and judgment and 5/16 of proceeds less 5/16 of costs thereafter. Mesa appealed; the Baptists and Hugoton Energy cross-appealed from the district court's determination of the amount of their recovery.

On that first appeal, this court agreed that Mesa had breached the contract, but it concluded that the contract should have been reformed rather than terminated. The case was remanded with directions. *Kansas Baptist Convention v. Mesa Operating Limited Partnership*, 253 Kan. 717, 864 P.2d 204 (1993) (*Mesa I*). The district court reformed the contract, and damages were calculated at $243,215.06. The request of the Baptists and Hugoton Energy for prejudgment interest was denied. Mesa appeals from the judgment reforming the price provisions of the contract and awarding damages. The Baptists and Hugoton Energy cross-appeal from that part of the judgment which denied an award of prejudgment interest. The appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

The factual background for this appeal is stated in the court's opinion in *Mesa I* and need not be restated here except as needed to resolve this appeal.

In *Mesa I*, the district court concluded that Mesa had breached the agreement on May 25, 1988, when it began drilling the third well and that the contract became void on that day. The district court further concluded that because the unit still existed, the Baptists and Hugoton Energy were entitled to $5/16$ of the production from the unit. Accordingly, the district court ordered judgment for the Baptists and Hugoton Energy (1) in the amount of $185,220.86 for production through April 1992, (2) $5/16$ of proceeds from unit production less expenses from May 1, 1992, to the date of the journal entry (July 27, 1992) plus prejudgment interest, and (3) $5/16$ of proceeds from future unit production less $5/16$ of reasonable costs and expenses.

On Mesa's appeal from the district court's judgment, this court agreed that Mesa breached the agreement on May 25, 1988, when it began drilling the third well. This court disagreed, however, that the contract should have been terminated as a result of the breach. This court stated:

"[T]ermination of the contract merely shifts the inequities from the plaintiffs to the defendant. The parties entered into a long-term executory contract in which Mesa obtained a long-term supply of natural gas and the plaintiffs initially received an acceptable price for their interest in the gas produced and sold under the

contract. The remedy, therefore, should preserve the mutual benefits of this long-term contract under the changed circumstances. The least drastic remedy should be applied which will provide equity and justice to the parties. We note that plaintiffs' cause of action includes, as an alternative to avoiding the contract, a prayer for reformation of the contract to require the defendant to pay market price for the natural gas. We conclude that reformation of the contract, and not termination, is the appropriate remedy which will best preserve to each party the benefits they initially intended and contemplated receiving from the contract." 253 Kan. at 737.

With regard to the task of the district court on remand, this court stated:

"Upon remand, the district court must determine to what extent the price and cost terms for drilling and operating of the natural gas wells and for sale of the natural gas should be modified. The district court should fashion a remedy modifying the contract in light of the changed circumstances that have rendered the contract unconscionable. To avoid injustice to the parties, the modification should attempt to preserve the original purpose and expectations of the parties in light of the changed circumstances. Since enforcement of the contract as modified is the appropriate remedy in the present case, it follows that the damages for defendant's breach of the contract must be determined based upon the contract as it is modified by the district court." 253 Kan. at 740.

On June 1, 1994, the district court heard arguments of counsel on the appropriate remedy and accepted the briefs and exhibits of the parties. It was agreed that counsel's statements reflected the substance of what witnesses for the Baptists and Hugoton Energy would have said and that Mesa's Exhibit M would serve to illustrate the content of testimony it would have presented. Post-hearing suggestions were filed. On June 23, 1994, the district court filed its findings. After reciting the respective contentions of the parties, the district court stated:

"[Mesa] operates its wells by gathering lines from each well to a central plant where gasoline and other liquifiable hydrocarbons are removed. The processed gas stream is then sold to Kansas Power and Light Company (KP&L) at the 'tailgate' of this plant. . . . [T]he court finds this extraction process represents approximately 20% of the total revenues received by Mesa from field revenue. . . .

"[The Baptists and Hugoton Energy] have conceded that the drilling costs of the infill well are reasonable. This court finds that [Mesa's] overhead and operating costs, while above the reported field averages, are reasonable. This court further

finds that Mesa, in its self-interest, is marketing the gas under contract to KP&L that exceeds the spot market and is beneficial to both seller and buyer.

"This court therefore concludes that the reformation should be achieved by using Mesa's sale price as to all production from the wells and offsetting this amount by the current charges as to operation and overhead and the $174,000.00 drilling costs for the infill well.

"This market price should be applied to all production . . . .

"This change allows reformation with only a change in the price provision of the original contract. It allows Mesa to extract the liquid hydrocarbons as anticipated in sale of the whole gas stream under the original agreement and allows this margin to Mesa for distribution and processing costs. It should be noted that value of these products has increased since the date of the original contract in paralleling the rise in crude oil prices. This means Mesa will pay its tailgate price to each well's individual production based on a 14.65 p.s.i.a. which is the industry standard. Mesa will retain the extracted products without accounting to [the Baptists and Hugoton Energy].

"[T]his reforms the contract so current values are applied to both price (revenue) and costs. This places the parties in the same relative economic position they were in on the 1952 date of the original contract. It retains the mutual benefit of a life of the field commitment for the production of natural gas and for improvement and development of that production. It retains for Mesa the profit of the extraction of components of the gas stream without accounting to the plaintiff owners. It obviously benefits [the Baptists and Hugoton Energy] by restoring ownership of minerals to them that were eliminated by a literal application of the original contract."

With the accounting which had been provided by the parties attached as Exhibit A, the district court filed its journal entry of judgment on August 19, 1994. Damages computed on the modified contract for the period from May 25, 1988, to June 1, 1994, (the date of the hearing on remand) totaled $243,215.06, and prejudgment interest was denied. It is expressly stated that "[e]xcept to the extent that it is reformed by this Journal Entry of Judgment, the 1952 Contract remains in full force and effect." The obligation of the Baptists and Hugoton Energy for costs and expenses was not changed; they remain obligated to pay 5/16 (31.25%) of all costs and expenses for the unit. With regard to Mesa's purchase of gas from the Baptists and Hugoton Energy, the journal entry states that Mesa remains obligated "to purchase, at the wellhead, all of plaintiffs' 31.25% interest in and to gas produced" from the unit. Mesa retained the right to process gas from the unit, to remove

gasoline, liquids, and liquefiable hydrocarbons, and to retain all proceeds from their sale. The changes in the price to be paid by Mesa for the gas of the Baptists and Hugoton Energy are stated in the journal entry as follows:

"In consideration for the purchase of plaintiffs' 31.25% interest in and to gas produced from the Baptist-Fischer Unit, defendants shall pay to plaintiffs the following amounts:

a. the actual price per Mcf received by defendants for sales of irrigation gas at the wellhead from the Baptist-Fischer Unit multiplied by 31.25% of all volumes of irrigation gas (measured at a pressure base of 14.65 pounds per square inch absolute, with an assumed flowing temperature of sixty degrees (60) Fahrenheit) actually sold from the Baptist-Fischer Unit; and

b. the actual price per Mcf which defendants receive from the sale or sales of the residue gas stream attributable to the Baptist-Fischer Unit at the tailgate of any processing plant multiplied by 31.25% of all wet wellhead volumes of gas produced at the wellhead of the Baptist-Fischer Unit (measured at a pressure base of 14.65 pounds per square inch absolute, with an assumed flowing temperature of sixty degrees (60) Fahrenheit), after deducting any volumes of irrigation gas previously sold at the wellhead."

Mesa appealed from the district court's judgment; the Baptists and Hugoton Energy cross-appealed from the district court's denial of their request for prejudgment interest.

Mesa stated two issues to be decided on appeal:

1. Did the trial court err as a matter of law by making a new contract for the parties in violation of the Supreme Court mandate in *Mesa I*?

2. Did the trial court abuse its discretion in the manner in which it "reformed" the 1952 contract?

This formulation appears to have been derived from the standard of review which is advocated by Mesa. Mesa cites *Gillespie v. Seymour*, 250 Kan. 123, 143, 823 P.2d 782 (1991), where the court stated: "Our test on appellate review is not whether the remedy fashioned is the best remedy that could have been devised, but whether the remedy so fashioned is erroneous as a matter of law or constitutes a breach of trial court discretion." In that case, the district court assessed damages for the diminution in value of plaintiffs' trust assets, and this court was reviewing the computation of

damages. The procedural status of this case, in contrast, is an appeal after remand.

The parties cite no case to the court in which the scope and extent of review on subsequent appeal is discussed. The general rule was stated in *W.K.H. Trust Co. v. Building Co.*, 160 Kan. 605, Syl. ¶ 1, 164 P.2d 143 (1945), as follows:

> "In this jurisdiction where, on appeal, a case has been reversed and remanded a trial court has no duty to perform except to spread the mandate of record and to proceed to have the judgment of the appellate court carried out. Such court has no authority to consider other matters not contained in the mandate and its authority is restricted to the rendition of judgment as authorized by its terms."

In *W.K.H. Trust Co.*, we further stated: "Besides, whether a trial court has complied with the decision and mandate of the appellate court is purely a question of law and our decisions are that a motion for a new trial is never necessary to secure review of such a question." 160 Kan. at 609.

In *Mesa I*, this court directed the district court to study the price and cost terms of the contract and to make modifications which would "preserve the original purpose and expectations of the parties in light of the changed circumstances." 253 Kan. at 740. In response to the mandate, the district court considered the parties' contentions and proposed modifications, modified the price term of the agreement, and computed damages using the modified price. Mesa appealed, complaining only of the legal suitability of modifications to the agreement and not of the process by which the district court judge reached his conclusions. On this court's review of the second appeal, therefore, the only issue is whether the district court's reformation satisfies the mandate. There is no reason for the court to review its former decision in this same cause and on the same facts. This court will not consider questions which could have been answered in the previous appeal, nor does this court engage in a full-scale review of the proceedings in the district court. Instead, at issue is the adherence to and enforcement of this court's instructions to the district court. Thus, the district court's reformation of the contract will be reviewed for conformance with the mandate.

The purpose of the remand was to reform the agreement so that it again reflects the actual agreement of the parties, which had been distorted by the extreme intervening occurrences. This court directed the district court to "preserve the mutual benefits" of the agreement and cautioned that "[t]he least drastic remedy should be applied which will provide equity and justice to the parties." 253 Kan. at 737.

Mesa contends that the district court's reform of the price component of the contract creates a windfall for the Baptists and Hugoton Energy instead of restoring the original expectations of the parties, as instructed by this court. Mesa specifies the following as original expectations which have been frustrated by the reformation: In 1952, (1) the Baptists neither contracted for nor intended to receive market price or market value for sale of their gas; (2) the Baptists anticipated that their margin would shrink as costs increased; (3) Mesa's predecessor expected to make a profit from the resale of the gas it purchased from the Baptists; and (4) the type of contract entered into by the parties in 1952 was a "gas purchase and sale contract."

Whether the reformation is in accord with the mandate may be determined by a comparison of verifiable original expectations with established results of modification. Material changes in the parties' mutual benefits would raise a serious question whether the remedy conforms to the mandate.

As to Mesa's first specification, Article V of the 1952 contract provided in pertinent part:

"[The Baptists] hereby agree to sell and [Mesa] agrees to purchase at the wellhead for such time as any natural gas is produced from the Unitized Area the proportionate share of such natural gas owned by [the Baptists] at a price of 10¢ per MCF, measured at a pressure base of 16.4 pounds per square inch absolute, with an assumed flowing temperature of sixty degrees (60°) Fahrenheit. Such price shall be full consideration for such natural gas, including all constituents thereof, and including, but not limited to, its content of gasoline and liquefiable hydrocarbons."

Article X provided in pertinent part:

"It is specifically understood and agreed that . . . the aforesaid price to be paid by [Mesa] to the other parties hereto for their proportionate share of the gas

shall be full consideration for such natural gas, whether or not the market value of such gas at any given time shall be more or less than such amount."

Mesa seems to be contending that Article X of the 1952 contract speaks for itself and establishes that the Baptists did not contract for market price for their gas.

In fact, the price set in the 1952 contract was right at market price. The price in the contract is 10¢/Mcf at 16.4 p.s.i.a. (pounds per square inch absolute). According to Mesa, that figure would be 8.9¢/Mcf at 14.65 p.s.i.a. A table from the Energy Information Administration/Natural Gas Annual 1987 Volume II shows the average wellhead price of marketed production in 1952 as 8¢/Mcf at 14.65 p.s.i.a. It also shows that from 1930 to 1952, the average wellhead price fluctuated only 3¢, from 8¢ in 1930 to 5¢ in 1940 and back up to 8¢ by 1952.

We do not find from the record and arguments presented to this court that the Baptists did not contract in 1952 to receive market price or market value for their gas. Despite the express disclaimer in Article X of the contract, the fact remains that the price set in the contract closely reflected the then current market price or value.

With regard to the result of the district court's modifying the terms of the contract, there is no real dispute that the Baptists and Hugoton Energy receive market price or value for the sale of their gas. The Baptists and Hugoton Energy prefer to say that they receive "a current reasonable price for the gas at the wellhead." In any case, the parties agree that the price paid by KP&L to Mesa for the gas it purchases at the tailgate of the processing plant is a current reasonable price. Under the reformed contract, the Baptists and Hugoton Energy receive from Mesa for their gas the same price Mesa receives from KP&L. Thus, they receive a current reasonable price.

There are no glaring discrepancies between verifiable original expectations regarding market price/value and the results of modification. Both could be described as current reasonable prices in that they closely reflect the market.

The Baptists and Hugoton Energy make the additional argument that this court's opinion in *Mesa I* required the district court to set

the reformed price term at market price. They note that a commentator so interpreted the court's opinion. Newsletter, *Oil, Gas & Mineral Law Section of the Kansas Bar Association*, Vol. 6, No. 1 (Jan. 1994), and Pierce, *Case Law Update—Mischief or Enlightenment? Yes!*, 112th Annual Meeting, KBA, Oil, Gas & Mineral Law Section (June 1994). Writing about the remedy, the court did state:

"We note that plaintiffs' cause of action includes, as an alternative to avoiding the contract, a prayer for reformation of the contract to require the defendant to pay market price for the natural gas. We conclude that reformation of the contract, and not termination, is the appropriate remedy which will best preserve to each party the benefits they initially intended and contemplated receiving from the contract." 253 Kan. at 737.

The market or reasonable price of the gas is only one element considered by the district court in reforming the contract and must be kept in perspective. The requirement to reform the agreement flows from Mesa's breach in drilling the third well and is affected by the tremendous increase in both price and costs.

The Baptists and Hugoton Energy offer K.S.A. 84-2-305 as additional support for the district court's changing the price term from 10¢ to market price. The provision states in pertinent part: "The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery." K.S.A. 84-2-305(1).

As to Mesa's second specification, Mesa contends that the Baptists "must have contemplated and anticipated" that its margin would diminish as costs increased. It is a matter of common sense, as Mesa suggests, that unfixed costs can bite into fixed income, but the size of the bite may be a surprise. In *Mesa I*, this court stated: "Although the parties could have anticipated some change in the drilling and operating costs and the market price for natural gas, we agree with the district court that the parties could not have reasonably foreseen at the time of entering the contract the tremendous increase that has occurred." 253 Kan. at 736.

Mesa also attempts to establish this point by showing that the Baptists' earnings from the unit before this suit was filed nearly equaled the amount which their attorney predicted they "would

receive over the entire life of the lease." Mesa's point is not well taken. The Baptists' attorney wrote in 1953 that an estimate of net income "over a period of 20 or 30 years might [be] . . . as much as $100,000.00." Gas has been produced for 42 years, and there is no indication that an end of "the entire life" of the unit is in sight. When suit was filed in 1988, the unit had been producing for 35 years, and, according to Mesa, the Baptists had received net gas income of $81,257 and $13,757 for the sale of 90% of its minerals to Hugoton Energy.

Mesa makes the related argument that the net income anticipated by the Baptists in 1952 will be far exceeded by projected profits under the reformed contract. The net income which the Baptists and Hugoton Energy will receive under the reformed contract for the period from May 1988 to the end of the unit's productive life is predicted by Mesa to be $1,872,893. Mesa states that this figure is "Calculated from Court's Findings." The calculation surely must involve the predicted remaining economic life of the unit, but this court is unable to determine what that is or what other factors are in the calculation. In any event, comparison of (1) an estimate of net income of the Baptists and Hugoton Energy from 1988 to the end of the unit's productive period with (2) what Robert Johnson, one of the Baptists' original attorneys in 1952, suggested the net income might be for the period from 1953 to 1973 or 1983 establishes little except the tremendous increase in the price of gas.

Mesa, in its third specification, contends that in 1952 its predecessor expected to make a profit "on the resale of gas of at least 50%." Mesa states that support for the amount of profit expected is in the 1948 contract with KP&L and in the record on appeal and the opinion in *Matzen v. Hugoton Production Co.*, 182 Kan. 456, 321 P.2d 576 (1958). What Mesa refers to as the *Matzen* record on appeal actually is the appellant's abstract of the record, Attachment C to Mesa's brief, which was stricken at the request of the Baptists and Hugoton Energy. The 1948 contract between Hugoton Production Company and KP&L provides that Mesa's predecessor will receive no less than 12¢ per Mcf at 14.9 p.s.i.a. The contract provided for price adjustments at five-year intervals. In

November 1954, the base price for processed gas was raised to 15.65¢ per Mcf at 14.9 p.s.i.a. 182 Kan. at 458. As we have seen, the 1952 contract between the Baptists and Hugoton Production Co. set the price at which Hugoton Production Co. bought gas from the mineral owners at 10¢ per Mcf at 16.4 p.s.i.a., which, according to Mesa, converts to 8.9¢ per Mcf at 14.65 p.s.i.a. Thus, it appears that in 1952 the difference between what Hugoton Production paid and what it was paid was approximately 3¢, which could increase but not decrease.

Mesa hikes the expected margin figure from 25% to 50% by giving itself the benefit of the doubt at every turn. First, Mesa asserts that its predecessor "knew," based on increasing prices in the Hugoton Field, that the price paid by KP&L would increase under the escalation clause of the 1948 contract. Mesa purports to show what its predecessor knew about increasing prices at the time it entered into the contract in July 1952 by recounting prices and price harbingers from both before and after 1952. Although the post-July 1952 indicators show that prices did climb, they are not germane to what Hugoton Production was forecasting when it signed the contract with the Baptists. Mesa gives the following examples of prices and upward price movement from the period before the 1952 contract: In 1948 " 'the prevailing price for the gas in the [Hugoton] field was approximately five and one-half cents per M.c.f. based on 16.4 pounds p.s.i.a.' " *Mesa I*, 253 Kan. at 720 (quoting *Matzen*, 182 Kan. at 458). "The supply was greatly in excess of the market demands." *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 169 Kan. 722, 724, 222 P.2d 704 (1950). In 1949, in response to a petition filed by royalty owners alleging that preventable waste existed due at least in part to the lack of price support, the KCC set the minimum price for Hugoton Field gas at 8¢ per Mcf at 16.4 p.s.i.a. *Pan American Petroleum Corporation v. Cities Service Gas Co.*, 191 Kan. 511, 382 P.2d 645 (1963), involved a 1950 gas purchase contract in which the price for Hugoton Field gas was set at 8.4¢ per Mcf (unspecified pressure) until June 1961, when it would increase to not less that 12¢ per Mcf. Second, Mesa asserts that its predecessor knew that the overall price it received from KP&L would exceed 12¢ per Mcf

because, under the 1948 contract, the price of gas sold to KP&L for power plant use, as opposed to resale gas, was 15¢ per million British Thermal Units (MMBtu). Examination of the 1948 contract discloses that it tied the power plant gas price to the price of coal, provided for semi-annual adjustment up or *down*, and established a floor of 12¢. In its brief, Mesa states: "By letter of December 30, 1949, KP&L and [Hugoton Production] had agreed that for billing purposes it would be assumed that 25% of all volumes of gas sold to KP&L were consumed for power plant use, and were to be billed at 15¢ per MMBtu." Examination of the letter discloses that the 25% assumption was to operate only through 1954. Thus, neither the 15¢ price nor the 25% volume was fixed.

Because Mesa exaggerated the degree to which the contract and the letter favored it, there is little reason to credit Mesa's second assertion. Moreover, we do not know from material provided by Mesa whether a price per Mcf at 16.4 p.s.i.a. is comparable to a price per MMBtu. In summary, a reasonable inference may be drawn from the precontract prices that Mesa's predecessor anticipated an upward trend in prices. It reasonably follows that, under the "weighted average price" formula of the 1948 contract, Mesa's predecessor anticipated upward adjustments of the price paid by KP&L. The upward adjustments would reasonably have been expected to somewhat increase the 3¢ profit. Mesa's assertion that its predecessor "reasonably contemplated receiving a margin on the resale of gas of at least 50%," however, cannot be established from the facts and figures supplied by Mesa.

The remedy devised by the district court completely eliminates profit for Mesa from the Baptists/Hugoton Energy gas sold to KP&L. Thus, Mesa's predecessor's 1952 expectation of making profit from the resale of the gas it purchased from the Baptists was not satisfied by the reformation. The 1952 expectations for overall profitability, however, may be met or even exceeded despite elimination of the margin from this particular source.

In specification four, Mesa contends that the district court's reformation has the effect of making a completely new and different type of contract for the parties. Mesa contends that the gas purchase and sale contract, by which it bought gas at the wellhead

from the Baptists and sold it to KP&L at the tailgate of the processing plant, became a gas processing contract, by which Mesa's only revenue is derived from the sale of the liquid hydrocarbons extracted from the gas during processing. Under the original contract, Mesa's predecessor derived revenue from the sale of extracted hydrocarbons as well as from resale of the gas to KP&L.

The Baptists and Hugoton Energy contend that Mesa's proposed methods of reformation would have changed the type of agreement but that the district court's solution did not. They characterize the 1952 contract as a revenue sharing/cost sharing arrangement. Mesa presented the following four suggestions to the district court: (1) Baptists and Hugoton Energy continue to receive the 1952 contract price (10¢/Mcf at 16.4 p.s.i.a.) for gas and pay no costs; (2) the Baptists and Hugoton Energy receive a fixed percentage of the sale price of gas and pay no costs; (3) the Baptists and Hugoton Energy receive the 1952 contract price for 67.6% of the gas (reserves accounted for by first two wells) and market price for 32.4% and would pay reduced costs; and( 4) the Baptists and Hugoton Energy would receive the 1952 contract price increased annually either by 4% or according to the Producer Price Index for Commodities and would pay reduced costs. According to the Baptists and Hugoton Energy, the first would remove the cost sharing aspect of the 1952 contract. The second also would eliminate cost sharing and would create a lease royalty arrangement. The third would divide a unit agreement into three well contracts with exceptionally disparate terms. The fourth would restructure the economic arrangement by inserting a price escalation clause into the agreement. In contrast, the district court's reformation of the price term of the agreement, they argue, did not restructure the deal and preserved virtually all terms.

Mesa argues that the revenue it earns from the sale of extracted liquids "does not represent a 'net profit' to Mesa." The first reason Mesa offers for this alleged effect is that Mesa pays the Baptists and Hugoton Energy the "tailgate" price for wellhead volumes. According to Mesa, the extraction of liquid hydrocarbons from the gas reduces the volume so that KP&L buys less gas by volume from Mesa than Mesa buys from the Baptists and Hugoton Energy. Be-

cause the price, at least of the gas not destined for power plant use, is set by volume, Mesa contends that it pays more to the Baptists and Hugoton Energy than KP&L pays to it. The second reason for the alleged effect is that Mesa pays the costs incurred between the wellhead and the tailgate of the processing plant. According to Mesa, the contract charges none of the costs of gathering, compressing, and transporting the gas to the mineral owners.

Both "reasons" given by Mesa accurately state the terms of the contract, but neither independently nor in combination do they necessarily lead to the conclusion that revenue from the sale of liquid hydrocarbons "does not represent a 'net profit' to Mesa." The district court found that the "extraction process represents approximately 20% of the total revenues received by Mesa from field revenue." Moreover, the contention is of questionable relevance to the question of the reformation of the contract. The sale of all extracted liquid hydrocarbons, including Mesa's $^{11}/_{16}$, provides Mesa with income from the unit. Mesa's complaint that it pays to the Baptists and Hugoton Energy more dollars than it receives from KP&L for their $^{5}/_{16}$ of the gas would necessarily lead to the conclusion that revenue from the sale of liquid hydrocarbons did not represent a net profit only if the difference between what it pays and what it is paid is greater than total liquid hydrocarbon sales from the unit. Total liquids sales, however, are not before the court, either in figures or in the scope of the inquiry. Preserving the original purpose and expectations of the parties with respect to one another is the goal of contract reformation. As previously discussed, in 1952 the difference between what Hugoton Production paid under the contract with the Baptists and what it was paid by KP&L was approximately 3¢. Then, as now, the volume of gas for which the Baptists were paid was determined at the wellhead. The reduction in volume from processing resulted in less gas being sold to KP&L than was purchased at the wellhead. The 3¢ margin, therefore, was only gained on the volume sold to KP&L. Then, as now, the operator paid costs of gathering, compressing, and transporting. Then, as now, the operator was entitled to revenue from the sale of extracted liquids. Then, as now, the benefits of the contract were not measurable strictly from the net income of one

layer of a multi-tiered operation. In this case, all parties gained the advantage of unitization of their 640 acres, Mesa's predecessor obtained a long-term supply of natural gas, the holders of the mineral rights obtained operation of the unit, and Mesa's predecessor's production costs were to be borne in proportion to ownership of gas production. These benefits remain under the reformed contract.

Mesa argues that its "reserve-based, weighted-average price approach," the third proposal described above, better preserves the mutual benefits of the 1952 contract than does the district court's reformation of the price term. Mesa argues that its proposal gives to the Baptists and Hugoton Energy the benefit of current prices for gas from the infill well and preserves for Mesa the benefit of the 1952 fixed price on gas from the other two wells. In contrast, Mesa argues, the district court's reformation deprives Mesa of the benefit of revenue from the post-processing sale of the Baptists and Hugoton Energy's gas. As is true of most of Mesa's arguments to this court, this argument diverts the focus away from the actual inquiry, which is whether the reformation conforms to the mandate. This court's review is not to measure the parties' proposals for reformation against the method adopted by the district court to see which conforms most closely to the mandate. Only if we find that the district court's reformation was not in accord with the mandate would there be occasion to examine Mesa's suggested methods of reforming the contract. Here, Mesa contends that its revenue from post-processing sale of the Baptists and Hugoton Energy's gas is a benefit without which the mandate is not satisfied. We note, however, that Mesa initially proposed to pay to the Baptists and Hugoton Energy "the actual amount which Mesa received from resale of the residue gas stream." In other words, Mesa's own initial suggestion to the district court deprived it of any revenue from post-processing sale of the Baptists and Hugoton Energy's gas to KP&L.

Mesa's final argument is that the district court's reformation of the contract is arbitrary and out of sync with equitable principles. Mesa argues that the arbitrary, inequitable remedy constitutes an

abuse of the district court's discretion. We consider this contention as it relates to the remedy's conformance with the mandate.

The arbitrary nature of the remedy is demonstrated, according to Mesa, by its exceeding what was requested by the Baptists and Hugoton Energy. They asked the district court "to provide for a price at fair market value . . . adjusted, if at all, by a minimal marketing margin . . . of no more than one and one-half percent, and [to] modify the cost provision of the contract to provide . . . to Mesa exactly the median amount of cost." We do not know whether the net gain by the Baptists and Hugoton Energy exceeded what they requested. Although the Baptists and Hugoton Energy stated that they would accept 98.5% of the price paid by KP&L and they received 100%, what they gained in the price term was moderated by the district court's denying their request for modification of the cost provision.

Arbitrariness also is shown, according to Mesa, in the windfall bestowed on Hugoton Energy. Mesa asserts that Hugoton Energy will receive a 12,000% return of $1,684,200 on its investment of $13,757.17 for 9/10 of the Baptists' holdings. The Baptists and Hugoton Energy do not dispute the figures. Instead, they urge this court to disregard the argument. First, they contend that unjust enrichment is an argument or issue which was decided in *Mesa I* and which may not be resurrected in this remedy phase of the case. Second, they contend that Mesa, an adjudged wrongdoer in that it breached the 1952 contract, is not in a position to demand equity. Mesa did raise the unjust enrichment in *Mesa I*, and it was rejected by this court. Since it was not affected by the reversal of the district court's judgment, it is res judicata. *Coryell v. Hardy*, 146 Kan. 522, 525, 72 P.2d 457 (1937).

We next turn to the Baptists and Hugoton Energy's cross-appeal. The journal entry contains the following disposition of questions of prejudgment interest:

"Plaintiffs' request for prejudgment interest is denied for the reason that plaintiffs' claim does not involve a liquidated amount which is definitely ascertainable by mathematical computation, and the claim has been the subject of a bona fide dispute between the parties. Because the Court is not allowing plaintiffs prejudgment interest for past periods, defendants shall not be entitled to the contractual

interest rate on any drilling, operating or overhead costs owed by plaintiffs for past periods."

The Baptists and Hugoton Energy make three arguments why they should have been awarded prejudgment interest on the amount of the damages awarded for the period from the breach of contract to the entry of judgment. First, they contend that the law-of-the-case doctrine precluded the district court's changing its initial decision to award prejudgment interest. Second, they contend that their claim constituted a liquidated claim for which an award of prejudgment interest was appropriate. Third, they contend that equitable principles support an award of prejudgment interest. Without citation to authority, they assert that the standard of review on this issue is de novo.

Mesa agrees that this court's review is de novo on the legal questions whether the initial award of prejudgment interest became the law of the case and whether the claim of the Baptists and Hugoton Energy was liquidated. Mesa, however, contends that "in deciding whether the district court erred in denying prejudgment interest, the standard is whether the court abused its discretion." It relies on *Farmers State Bank v. Production Cred. Ass'n of St. Cloud*, 243 Kan. 87, Syl. ¶ 7, 755 P.2d 518 (1988), which states:

"The district court has the discretion to award prejudgment interest at the prejudgment rate provided by K.S.A. 16-201 on an unliquidated claim when a party has had use of the money, the opposing party has been deprived of that use, and the order is necessary to award full compensation."

Thus, it appears that under the authority cited by Mesa, the application of an abuse of discretion standard of review is applicable to interest on unliquidated claims.

An award of prejudgment interest is governed by K.S.A. 16-201, which provides in pertinent part:

"Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the

forbearance of payment whereof an express promise to pay interest has been made."

In the journal entry from which the first appeal in this case was taken, the district court found: "Under the doctrine of unjust enrichment, Mesa is liable for interest on moneys of the plaintiffs that it has withheld." The district court further stated:

"The plaintiffs are entitled to judgment in the amount of $185,220.86. This amount includes payments due for production through the month of April 1992 (except for the proceeds from the sale of helium for the month of April 1992) and interest through April 30, 1992. Plaintiffs are entitled to further judgment in the amount of 5/16ths of the proceeds from the sale of the products of the wells, less reasonable operating and production expenses, for the period from May 1, 1992, to the date of this Journal Entry, with additional prejudgment interest."

In April 1992, the district court judge issued a memorandum clarifying previous rulings and setting the stage for final disposition of the matter. The journal entry was filed on July 27, 1992. Even though the district court judge's memorandum dated April 16, 1992, states, "Under authority of the cases requiring interest on suspended royalties, I would impose prejudgment interest in this case based on stipulations filed of the average weighted price received by defendant from this unit, less reasonable costs of production, since the date of breach of the contract," from a plain reading of the journal entry, one would conclude that the award of prejudgment interest applied only to 5/16 of the proceeds from gas production less expenses for the period May 1 to July 27, 1992.

Mesa's notice of appeal states that it appealed from "all adverse rulings and from those parts of the judgment below which . . . enter a money judgment against Mesa for the value of gas taken after May 25, 1988, including prejudgment interest." Prejudgment interest, however, was not an issue raised by Mesa in its briefs in *Mesa I*.

The Baptists and Hugoton Energy contend that Mesa's failure specifically to contest its liability for prejudgment interest, which was a part of an appealable order, caused the ruling to become the law of the case. They rely on *State v. Finical*, 254 Kan. 529, 532, 867 P.2d 322 (1994); *Stamps v. Consolidated Underwriters*, 208 Kan. 630, 636, 493 P.2d 246 (1972); and *Grohusky v. Atlas Assur-*

*ance Co.*, 194 Kan. 460, 462, 399 P.2d 797 (1965). For application of the law of the case to a second appeal, they cite *Estes v. Zinc Co.*, 97 Kan. 774, Syl. ¶ 2, 156 Pac. 758 (1916), and *Harwi v. Klippert*, 73 Kan. 783, 85 Pac. 784 (1906) (quoting *Headley v. Challis*, 15 Kan. 602, Syl. [1875]). All authorities cited by the Baptists and Hugoton Energy support the principle that an appeal must be taken from an appealable ruling of the district court in order to prevent it from controlling further proceedings. "Right or wrong—that ruling, from which no appeal was taken, became the law of the case." *Grohusky*, 194 Kan. at 462. However, in *Puritan-Bennett Corp. v. Richter*, 235 Kan. 251, 254-55, 679 P.2d 206 (1984), we said:

"The district court in this case found in its initial conclusions of law that the contract was reasonable in its scope. The appellant did not appeal from that ruling. Consequently the Court of Appeals stated: 'The trial court found the covenant in this case to be reasonable and that point is not disputed on appeal.' [*Puritan-Bennett Corp. v. Richter*, 8 Kan. App. 2d 311, 313, 657 P.2d 589, *rev. denied* 233 Kan. 1092 (1983)]. This would seem to bar the raising of the issue now since the general rule is where appellant fails to brief an issue, that issue is waived or abandoned. *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 561, 608 P.2d 936 (1980). On remand, however, the district court again found the agreement reasonable. Also, appellant validly argues the issue was not relevant until the case was remanded and the district court applied the restrictive covenant of the contract for the first time. The trial court finding there was no consideration for the contract provision rendered its determination of reasonableness mere dicta. Richter raised the issue of reasonableness on remand. Thus, the issue is properly before us."

Here, the issue of prejudgment interest was before the trial court on remand.

Mesa concedes that it did not expressly raise the question of prejudgment interest in its brief on the first appeal, but it argues that the district court's award of prejudgment interest did not thereby become the law of the case. Mesa contends that on the first appeal, the award of prejudgment interest, of necessity, was overturned by this court along with the award of damages and the rationale for the awards. In Mesa's words, "[t]his change of theories for determination of damages necessarily included the reconsideration of the issue of prejudgment interest, since the trial court's

earlier legal basis for granting prejudgment interest was no longer applicable." We agree.

Under a plain reading of the original decree, the district court awarded damages in an amount equal to 5⁄16 of the proceeds from the gas produced from the unit from May 25, 1988, through April 1992 plus 5⁄16 of the proceeds less reasonable operating and production expenses from May 1, 1992, to July 27, 1992, the date the journal entry was filed. It appears that the rationale for the measure of damages was that in the absence of a contract setting different terms, the Baptists and Hugoton Energy should receive a share of all proceeds which corresponded to the proportion of their interest in the gas production for the period between breach and the clarifying memorandum and pay an identical share of reasonable operating and production expenses for the brief period between the memorandum and the journal entry. On remand, the district court awarded damages in an amount equal to 5⁄16 (31.25%) of the proceeds received by Mesa from all sales of irrigation gas at the wellheads on the unit plus the price per Mcf received at the processing plant tailgate multiplied by 5⁄16 of the wet wellhead volume minus the volume of irrigation gas sold at the wellhead. In this arrangement, Mesa is to retain all proceeds from extracted liquefiable hydrocarbons, and the Baptists and Hugoton Energy are liable for 5⁄16 of "all drilling costs, operating costs and overhead costs incurred by [Mesa] in the drilling and operation of the . . . [u]nit," including drilling costs for the infill well (the drilling of which constituted the breach).

Neither party has brought to the court's attention any case in which the precise issue whether an unchallenged award of prejudgment interest survives reversal of a judgment awarding damages to become the law of the case on remand and a subsequent appeal. In the circumstances of this case, we find merit in Mesa's position. The original judgment awarded damages based on a share of proceeds in proportion to mineral interests. Proceeds were reduced by reasonable operation and production expenses for a brief period. The aim of the district court judge seems to have been to relieve the mineral holders from costs for the drilling of the well which constituted the breach and otherwise to base the award of

damages on a pragmatic division of income and outlay by participants in a joint enterprise which is not subject to an agreement which varies the proportions of their rewards and obligations from the obvious. The judgment on remand, in contrast, awarded damages based on the (reformed) terms of a contract which significantly varied the proportions by interjecting divisions by products and prices applied to volumes not actually sold at that rate.

Without question, the *amount* of the prejudgment interest awarded in the original decree was vacated along with the award of damages in this case. In this case, as Mesa argues, the nature as well as the amount of the award of damages were changed. In these circumstances, prejudgment interest which was appropriate to the original award may not be appropriate to the revised award. Instead of being the law of the case, an award of prejudgment interest in these circumstances should be considered anew on remand. This is not to say that circumstances cannot arise in which the reason why prejudgment interest was awarded is not affected by reversal of the original judgment. If that were the case, it might be that the reversal of a judgment and remand for retrial or recomputation of damages should not affect the decision that prejudgment interest was warranted (although it would require recomputation of the *amount*).

With regard to the contention that their claim was liquidated, the Baptists and Hugoton Energy state only that they sought "fair value for the gas taken and sold by Mesa." It appears that their argument is that they sought and got "fair value." That significantly stretches the meaning of liquidated. This court has defined liquidated as follows: "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation." *In re Tax Protests of Midland Industries, Inc.*, 237 Kan. 867, 868, 703 P.2d 840 (1985). As we have seen, it is within the discretion of the district court judge to award prejudgment interest on an unliquidated claim. In the circumstances of this case, we cannot say that no reasonable person would agree with the trial court's denial of the request for prejudgment interest.

Judgment of the district court is affirmed.

ABBOTT, J., not participating.

MARVIN W. MEYER, Judge Retired, assigned.