(959 P.2d 934)
No. 77,898

HOME BANK & TRUST COMPANY, A Kansas Banking Corporation, *Appellee,* v. CEDAR BLUFF CATTLE FEEDERS, INC., and BANK OF OKLAHOMA, N.A., *Appellants.*

Opinion filed May 22, 1998.

*Alan Joseph,* of Wichita, for appellants.

*Terry C. Cupps* and *James D. Oliver,* of Foulston & Siefkin, L.L.P., of Wichita, for appellee.

Before MARQUARDT, P.J., GERNON, J., and DAVID PRAGER, Chief Justice Retired, assigned.

MARQUARDT, J.: Cedar Bluff Cattle Feeders, Inc., and its assignee, Bank of Oklahoma, N.A., (Cedar Bluff) appeal from the decision of the district court that they did not have a purchase money security interest involving cattle. In the alternative, Cedar Bluff argues that it is entitled to be paid for the costs of caring for and feeding the cattle from the time that it repossessed them. Cedar Bluff also argues that the district court should not have awarded prejudgment interest to Home Bank & Trust Company (Home Bank).

C. C. Cattle Company, Inc., (C. C. Cattle) buys, grazes, and sells cattle. On March 4, 1991, Home Bank filed a financing statement covering C. C. Cattle's farm products, including livestock, and other property. On August 21, 1992, C. C. Cattle executed a $175,000 promissory note in favor of Home Bank and granted Home Bank a security interest in its inventory, farm products, livestock, accounts, and general intangibles whether owned at the time of the agreement or later acquired.

During August and September 1992, C. C. Cattle purchased 199 heifers and 125 steers for grazing and selling in January 1993. What happened to the cattle is not entirely clear from the evidence. The important point for this appeal is that Home Bank does not claim a purchase money security interest in the disputed collateral. In the priority dispute discussed below, Home Bank is a perfected secured creditor of C. C. Cattle.

Cedar Bluff, a feedlot, makes loans to customers to enable them to purchase cattle. C. C. Cattle and Cedar Bluff signed an agreement which provided that C. C. Cattle would "start 252 [head] of [heifers] beginning 2-9." This agreement, which was drafted and executed on March 5, 1993, provided that C. C. Cattle would own two-thirds of the cattle and that Cedar Bluff would own one-third. The president of C. C. Cattle testified that prior to signing the

agreement, the parties had agreed to the terms over the phone. The vice president of C. C. Cattle testified that the agreement was reached before the cattle were shipped to C. C. Cattle.

Cedar Bluff delivered 252 heifers to C. C. Cattle between February 9, 1993, and February 28, 1993. C. C. Cattle executed a promissory note dated February 9, 1993, in favor of Cedar Bluff for $63,898.02. C. C. Cattle and Cedar Bluff also executed a loan and security agreement dated February 17, 1993, which referenced the promissory note by which C. C. Cattle granted Cedar Bluff "a continuing first priority, security interest in and to the Cattle." The president of Cedar Bluff testified that the promissory note and the security agreement were filled .out by his secretary on March 8, 1993, and mailed to C. C. Cattle, which returned them on March 19, 1993.

C. C. Cattle gave Cedar Bluff a $16,800 check dated March 6, 1993. Cedar Bluff filed a financing statement on March 23, 1993, listing C. C. Cattle as the debtor and covering all cattle placed in partnership with Cedar Bluff. On March 31, 1993, Cedar Bluff assigned its rights under the loan and security agreement to the Bank of Oklahoma, N.A.

The president and general manager of Cedar Bluff testified that the heifers were delivered for grazing and that C. C. Cattle was to determine if it wanted to buy them. The district court found that the agreement was completed in January 1993 and that it went into effect on February 9, 1993, the date the first cattle were delivered. The district court rejected Cedar Bluff's assertion that the transaction was a sale on approval.

On April 8, 1993, Cedar Bluff picked up "its heifers" from C. C. Cattle. There was conflicting testimony as to whether all of the cattle belonged to Cedar Bluff. If all of the cattle did belong to Cedar Bluff, 53 head were missing and numerous others were dead. Based on the testimony of the various parties, the district court concluded: "[T]he Court is satisfied that the parties do not know whether these were heifers purchased with the Cedar Bluff or the Home Bank loans. The court concludes that these cattle were all commingled in the same pasture, could not be accurately distinguished and thus were fungible."

On April 15, 1993, Home Bank sent a notice to Cedar Bluff and others stating that Home Bank had a security interest in all cattle owned by C. C. Cattle. On April 23, 1993, Home Bank sent a letter to Cedar Bluff, requesting copies of the loan documents between Cedar Bluff and C. C. Cattle. On May 5, 1993, Home Bank sent a demand letter to Cedar Bluff, seeking possession of the cattle or proof that Cedar Bluff had a superior interest in the cattle. Cedar Bluff did not respond to any of these letters. On May 11, 1993, Home Bank filed this action seeking to enforce its security interest. Cedar Bluff sold the heifers in the summer and fall of 1993 for $136,802.34. Cedar Bluff deducted $49,888.98 from the sale proceeds for feed bills that it claimed were owed by C. C. Cattle and applied the remainder of the proceeds to C. C. Cattle's note with Cedar Bluff.

Cedar Bluff and Home Bank each claimed a superior security interest in the Cedar Bluff cattle. The district court concluded that Cedar Bluff's financing statement was filed more than 20 days after the purchase and delivery of the heifers; therefore, Cedar Bluff did not qualify for the purchase money security interest super priority available under K.S.A. 84-9-312(4). The district court also held that Home Bank's perfected security interest was superior to Cedar Bluff's interest pursuant to the first to file or perfect rule. See K.S.A. 84-9-312(5)(a). The district court held that Home Bank was entitled to recover two-thirds of the proceeds of the sale of the heifers, $91,110.36, plus interest from the date of the sale at the rate of 10 percent.

Cedar Bluff argues that the district court erred in holding that it did not perfect its purchase money security interest in the heifers within 20 days of possession by C. C. Cattle.

This court reviews factual findings to determine whether they are supported by substantial evidence and whether they are sufficient to support the conclusions of law. See *In re Estate of Hessenflow*, 21 Kan. App. 2d 761, 770, 909 P.2d 662 (1995), *rev. denied* 259 Kan. 928 (1996); see also *J. I. Case Credit Corp. v. Foos*, 11 Kan. App. 2d 185, 187, 717 P.2d 1064, *rev. denied* 239 Kan. 694 (1986) (evaluating priority of security interests under Article 9 of

the Uniform Commercial Code). This court's review of conclusions of law is unlimited. *Foos*, 11 Kan. App. 2d at 187.

Also at issue is the interpretation of the Uniform Commercial Code (UCC) as adopted by the Kansas Legislature. Interpretation of a statute is a question of law subject to unlimited review by this court. *Community Nat'l Bank v. Moyer*, 17 Kan. App. 2d 218, 219, 836 P.2d 1198, *rev. denied* 251 Kan. 937 (1992) (interpreting K.S.A. 1991 Supp. 84-9-401[2]).

When there are conflicting security interests, priority is determined by the time of filing or perfection. K.S.A. 84-9-312(5)(a). See *Foos*, 11 Kan. App. 2d at 188-89. When there are two perfected security interests, the first to file or perfect prevails. See Clark, The Law of Secured Transactions Under the Uniform Commercial Code § 3.08[1] (2d ed. 1988). Because Cedar Bluff filed its financing statement on March 23, 1993, well after Home Bank, Home Bank prevails under the first to file or perfect rule unless Cedar Bluff qualifies for the super priority for timely perfected purchase money security interests provided by K.S.A. 84-9-312(4). See *Moyer*, 17 Kan. App. 2d at 220.

K.S.A. 84-9-312(4) provides:

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter."

K.S.A. 84-9-105(1)(d) defines "debtor," in relevant part, as "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper."

The Kansas Comment, 1996 to K.S.A. 84-9-312(4) notes:

"One difficult issue is when the 'debtor receives possession' for purposes of the twenty-day grace period. In particular, when does the twenty days begin to run if the equipment is bought on approval, or under a lease with a purchase option which is not exercised until some time later? The weight of authority, and the better rule, is that the grace period does not begin to run until the buyer on approval or lessee makes a decision to purchase the equipment outright. [Citations omitted.]"

In *In re Michaels*, 156 Bankr. 584, 589-90 (Bankr. E.D. Wis. 1993), the court summarizes the conflicting standards as to when the debtor receives possession:

"The word 'possession' is not defined in the Uniform Commercial Code. Courts have interpreted 'possession' either by the 'physical control' standard or by the 'obligation' standard. [Citation omitted.]

"Under the 'physical control' standard, possession takes place when the recipient physically acquires the property. This is based upon a policy of avoiding secret liens. Prompt perfection prevents others, including the first filed floating lienor, from being misled by the ostensible ownership of the person in possession. . . .

"Under the 'obligation' standard, . . . it is the commitment to purchase by virtue of the underlying contract, rather than physical possession, which controls."

K.S.A. 84-2-401(2) provides:

"Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading."

Cedar Bluff applies the obligation standard and argues that this court should conclude that it timely perfected its purchase money security interests.

The obligation standard has been applied in cases involving a sale on approval or an option to purchase. See *Brodie Hotel Supply, Inc. v. United States*, 431 F.2d 1316, 1318-19 (9th Cir. 1970); *Michaels*, 156 Bankr. at 590; *Matter of Hooks*, 40 Bankr. 715, 720-22 (Bankr. M.D. Ga. 1984); *Valley Bank v. Estate of Rainsdon*, 117 Idaho 1085, 1091 n.2, 793 P.2d 1257 (Ct. App. 1990); *Int'l Harvester v. Bank of California*, 29 Wash. App. 905, 918, 632 P.2d 522 (1981). This case is factually distinguishable from cases applying the obligation standard because this was not a sale on approval or option to purchase.

Cedar Bluff does not expressly argue that the district court's factual findings are not supported by substantial evidence. Cedar Bluff does argue that it and C. C. Cattle initially had a bailment relationship and that the heifers were delivered on a sale on approval basis in February 1993. Cedar Bluff also argues that the 20-day window for filing a financing statement under K.S.A. 84-9-

312(4) did not begin to run until March 5, 1993, when C. C. Cattle delivered the down payment of $16,800; March 8, 1993, when C. C. Cattle claims the interest began to accrue on the promissory note; or March 19, 1993, when C. C. Cattle returned the loan documents.

At trial, Cedar Bluff presented evidence indicating that the initial delivery of the Cedar Bluff heifers constituted a sale on approval and that C. C. Cattle did not agree to buy the heifers until a later date. The district court made a contrary factual finding based upon, among other things, the testimony of C. C. Cattle officials that the parties had agreed that C. C. Cattle would own two-thirds of the heifers prior to the delivery. This factual finding is supported by substantial evidence. See *Foos*, 11 Kan. App. 2d at 187. Cedar Bluff's assertion on appeal that the delivery of the heifers created a bailment or constituted a sale on approval basis is not persuasive.

Here, the district court found that the parties had agreed to a purchase and its terms prior to delivery. Under K.S.A. 84-2-401(2), absent an explicit agreement to the contrary, title passed to C. C. Cattle at the time of delivery. See *North Platte State Bank v. Production Credit Assn.*, 189 Neb. 44, 50-51, 200 N.W.2d 1 (1972). As such, C. C. Cattle was a "debtor" because it owed a payment at this time. See K.S.A. 84-9-105(1)(d). Thus, the 20-day period of K.S.A. 84-9-312(4) began running upon delivery of the heifers. Because Cedar Bluff did not file its financing statement within 20 days of the date that the last delivery of heifers was made, it does not qualify for the purchase money super priority.

Cedar Bluff contends that Home Bank should pay it for the costs of caring for and feeding the heifers owned by C. C. Cattle and that if this court finds that Cedar Bluff had a timely perfected purchase money security interest, it need not address this issue.

The district court found that when Cedar Bluff sold the heifers, it deducted $49,888.98 in feed bills that it had charged to C. C. Cattle. Cedar Bluff applied the remainder of the sale proceeds to the Cedar Bluff note. In its brief, Cedar Bluff states that the total feed bill due Cedar Bluff from C. C. Cattle for its two-thirds interest in the heifers was approximately $33,250 and that a feed bill in excess of $20,000 remains unpaid.

At trial, Cedar Bluff noted that its loan and security agreement with C. C. Cattle entitled it to recover from C. C. Cattle any expenses incurred in caring for and feeding the heifers. Cedar Bluff argued that it was entitled to recover from Home Bank that portion of the feed bill involving C. C. Cattle's percentage of the heifers from the time that they were repossessed. The district court denied Cedar Bluff's claim. Cedar Bluff appeals on the theory of unjust enrichment.

To prevail on a claim of unjust enrichment, there must be:

" '(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.' " *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 177, 910 P.2d 839 (1996) (quoting *J. W. Thompson Co. v. Welles Products Corp.*, 243 Kan. 503, 512, 758 P.2d 738 [1988]).

Under the equitable doctrine of clean hands, no person may obtain relief in equity with respect to a transaction in which the person is guilty of inequitable conduct. *T. S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 720, 924 P.2d 1239 (1996). In *Security Benefit Life Ins. Corp. v. Fleming Companies, Inc.*, 21 Kan. App. 2d 833, 908 P.2d 1315 (1995), *rev. denied* 259 Kan. 928 (1996), this court evaluated an unjust enrichment claim. The *Security Benefit* court stated:

"In 66 Am Jur. 2d, Restitution and Implied Contracts § 4, p. 947, cited by the *J. W. Thompson* court, the authors note that in order for restitution to be required there must be a showing that 'the person sought to be charged had wrongfully secured a benefit, or had passively received one which it would be unconscionable for him to retain.' " 21 Kan. App. 2d at 844.

Cedar Bluff cites *Peterson v. Midland Nat'l Bank*, 242 Kan. 266, 275-76, 747 P.2d 159 (1987), as support for its claim; however, *Peterson* is distinguishable from the instant appeal in that the court relied on the fact that Peterson was an innocent bystander. Here, Cedar Bluff decided to repossess the heifers and to ignore Home Bank's requests for information. Cedar Bluff was not an innocent bystander.

Home Bank sent several notices to Cedar Bluff. When Cedar Bluff did not respond, Home Bank took legal action. Cedar Bluff retained possession of the heifers notwithstanding Home Bank's claim of interest. Cedar Bluff could have avoided the feed costs if it had responded in some way to Home Bank. Home Bank did not passively receive the benefit of Cedar Bluff feeding the heifers; rather, it received the benefit in opposition to its demand for possession. See *Security Benefit*, 21 Kan. App. 2d at 844. Under these circumstances, we conclude that equity does not require Home Bank to pay the feed bill.

Cedar Bluff also argues that the district court erred in awarding prejudgment interest.

"An award of prejudgment interest is governed by K.S.A. 16-201." *Kansas Baptist Convention v. Mesa Operating Ltd. Partnership*, 258 Kan. 226, 242, 898 P.2d 1131 (1995). "The allowance of prejudgment interest under K.S.A. 16-201 is a matter of judicial discretion subject to reversal only when there is an abuse of discretion." *Miller v. Botwin*, 258 Kan. 108, 119, 899 P.2d 1004 (1995); see *Mesa*, 258 Kan. at 242. If reasonable persons could differ regarding the propriety of the action taken by the district court, then it did not abuse its discretion. *Sage v. Williams*, 23 Kan. App. 2d 624, 632, 933 P.2d 775, *rev. denied* 262 Kan. 962 (1997).

"The general rule in Kansas is that prejudgment interest is allowable on liquidated claims. 'A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation. . . . [Citations omitted.]' " *Miller*, 258 Kan. at 119. "[T]hat a good-faith controversy exists as to whether the party is liable for the money does not preclude a grant of prejudgment interest." *Miller*, 258 Kan. at 119.

Cedar Bluff argues that the claim is still unliquidated because a dispute exists as to the disposition of the proceeds from the sale and whether Cedar Bluff is entitled to be paid for the feed bill. Cedar Bluff also notes that it is appealing whether it timely filed its purchase money security interest. These points, however, are nothing more than good-faith controversies over whether Cedar

Bluff is liable for the money. *Miller*, 258 Kan. at 119. Subject to these good-faith controversies, the amount of the claim became liquidated when Cedar Bluff sold the heifers. This argument lacks merit.

Affirmed.